## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| TEAM SYSTEMS INTERNATIONAL, LLC, | Bankr. Case No. 22-10066 (CTG) |
| Debtor. | |
| STEVEN M. ACOSTA, JOHN S. MACIOROWSKI, CHRISTOPHER MOTT, AND DEBORAH EVANS MOTT, | Civ. Case No. 23-01038 (GBW) |
| Appellants, | |
| v. | |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Team Systems International, LLC, | |
| Appellee. | |

## OPENING BRIEF BY APPELLANTS IN SUPPORT OF
## APPEAL FROM ORDER

**THE ROSNER LAW GROUP LLC**
Frederick B. Rosner (DE Bar No. 3995)
Zhao (Ruby) Liu (DE Bar No. 6436)
824 Market Street, Suite 810
Wilmington, DE 19801
Telephone: (302) 777-1111
Email: rosner@teamrosner.com
liu@teamrosner.com

**GOLENBOCK ASSOR BELL & PESKOE LLP**
Michael M. Munoz (admitted *pro hoc vice*)
711 Third Avenue
New York, New York 10570
Telephone: (212) 907-7345
mmunoz@golenbock.com

Dated: February 20, 2024

*Counsel for Appellants*

{00038169. }

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.......................................................................... iii

PRELIMINARY STATEMENT.................................................................... 1

STATEMENT OF JURISDICTION AND STANDARD OF REVIEW .................. 3

STATEMENT OF ISSUES .......................................................................... 4

STATEMENT OF THE CASE...................................................................... 5

    I.    Relevant Background ............................................................ 5

SUMMARY OF THE ARGUMENT ............................................................. 9

ARGUMENT ........................................................................................... 12

    I.    The Members Have Standing to Object to the 9019 Motion ............. 12

    II.    Legal Standards Applicable to the Trustee's Motion ......................... 15

    III.    The Bankruptcy Court Should Not Have Approved the Settlement ......................................................................... 16

        A.    Probability of Success............................................... 16

            1.    The Debtor Has Articulated Numerous Bases on Which the Judgment that Led to this Bankruptcy May be Overturned……………………………………….....16

                a. Unlawful contingent commission agreement……….17

                b. Lack of subject matter jurisdiction in the District Court…………………………………………..…22

                c. Limitation of commissions to Niagara-brand bottled water…………………………………………...25

d. No commissions on drop containers………………..29

e. Inflated damages and improper pre-judgment
interest…………………………………………………30

2.    The Trustee Failed to Articulate Any Valid Reason to
Believe that the Appeal Is Unlikely to Succeed............32

B.    The Already-Commenced Appeal Will Not Result in
Complex or Expensive Litigation .............................................33

C.    The Balancing of Interests as Between Interested Parties
Favors the Resolution of TSI's Pending Eleventh Circuit
Appeal .....................................................................................36

1.    The Proposed Settlement Is Excessively Generous and
Does Not Benefit the Debtor's Creditors or Members...36

2.    The Proposed Settlement Risks May Disable the Debtor
and Members from Competing for Future Federal
Contracts by Facilitating an Unlawful Contingent Fee
Arrangement..................................................................37

3.    The Potentially Unlawful Contingent Fee Arrangement
May Also Undermine the Federal Government's
Willingness to Pay the Debtor's Receivables…………38

CONCLUSION ..................................................................................43

CERTIFICATE OF COMPLIANCE ....................................................45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*CapitalKeys, LLC v. CIBER, Inc.*,
   875 F. Supp. 2d 59 (D.D.C. 2012)......................................................................20

*In re Diocese of Camden, N.J.*,
   Case No. 20-21257 (JNP), 653 B.R. 722 (D.N.J Aug. 29, 2023) ......................16

*Energy Smart Indus., LLC v. Morning Views Hotels-Beverly Hills,*
   *LLC*,
   660 F. App'x 859 (11th Cir. 2016) ....................................................................26

*I.U.B.A.C. Loc. Union No. 31 v. Anastasi Bros. Corp.*,
   600 F. Supp. 92 (S.D. Fla. 1984) ..................................................................20, 21

*Manus Corp. v. NRG Energy, Inc. (In re O'Brien Env't Energy, Inc.)*,
   188 F.3d 116 (3d Cir. 1999) ................................................................................3

*In re Martin*,
   91 F.3d 389 (3d Cir. 1996) ........................................................................*passim*

*Neiman v. Provident Life & Accident Ins. Co.*,
   217 F. Supp. 2d 1281 (S.D. Fla. 2002) ..............................................................20

*Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*,
   145 So.3d 989 (Fla. 4th DCA 2014) ..................................................................26

*Quinn v. Gulf & W. Corp.*,
   644 F.2d 89 (2d Cir. 1981) ................................................................................20

*In re Remsen Partners, Ltd.*,
   294 B.R. 557 (S.D.N.Y. 2003) ..........................................................................13

*In re RFE Indus., Inc.*,
   283 F.3d 159 (3d Cir. 2002) ..........................................................4, 13, 16, 36

**Statutes**

28 U.S.C. § 158(a) ...............................................................................................3

41 U.S.C. § 3901 ..............................................................................17, 20, 41

**Other Authorities**

FAR 2.101 ....................................................................................................42

FAR 3.402 ....................................................................................................41

FAR 9.103 ....................................................................................................38

FAR 9.104-6 .................................................................................................38

FAR 9.403 ....................................................................................................36

FAR 52.203 .............................................................................................15, 38

*Fed. R. Bankr. P. 9019* .......................................................................*passim*

Appellants Deborah Evans Mott, Steven M. Acosta, Christopher Mott, and John S. Maciorowski (collectively, the "Members" or "Appellants"), by and through their undersigned counsel, respectfully submit this Opening Brief in Support of Appellants' appeal from the *Order Granting* (the "Order") (A000717 – A000726)[1] *the Motion of the Chapter 7 Trustee (the "Trustee") for Entry of an Order Pursuant to Fed. R. Bankr. P 9019 Authorizing and Approving the Settlement Agreement Between the Trustee and the Judgment Creditors* (the "Motion") (A000001 – A000026) entered on September 20, 2023, by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Hon. Craig T. Goldblatt.

## **PRELIMINARY STATEMENT**

The Bankruptcy Court erred in approving the proposed settlement agreement (the "Proposed Settlement") between the Trustee and the Judgment Creditors. Appellants accordingly ask this Court to set aside the Bankruptcy Court's Order granting the Motion and approving the Proposed Settlement, pending the resolution of an appeal of a court decision that led to this bankruptcy proceeding, as described in detail below. Appellants additionally request that the Court correct the Bankruptcy Court's error and order discovery related to the Proposed Settlement, as the Trustee appears to lack any rational basis for entering into the Proposed Settlement.

---

[1] All exhibits are contained in an Appendix filed separately herewith. Citations to the Appendix throughout this brief shall take the form (A___).

The Debtor in this case (the "Debtor" or "TSI") filed for bankruptcy after being on the wrong end of a $6.2 million judgment arising from a breach of contract lawsuit that was tried in federal district court in Florida. The Debtor (post-judgment and pre-bankruptcy) invested in pursuit of an appeal of that judgment in the United States Court of Appeals for the Eleventh Circuit. An opening brief was filed, and that brief sets out compelling grounds for reversal of the district court judgment, with the core arguments focused upon independent legal grounds that do not depend on credibility assessments or challenges to the jury's findings of fact. If even one of the core appellate challenges were to succeed, it would reduce the judgment from $6.2 million to zero, and could end the litigation entirely (without a remand for a second trial). Debtor (funded by its individual members) has the opportunity to see the Eleventh Circuit appeal through to fruition, with the expense of a reply brief and potential oral argument being absorbed by the individual members, rather than Debtor's bankruptcy estate.

Given this background, any good-faith actor in Debtor's shoes would normally leap at the chance to pursue the appeal, especially if the only alternative was a "settlement" in which Debtor's Judgment Creditors would be paid 90 cents on the dollar in fulfillment of a $6.2 million judgment that is susceptible to multiple avenues of appellate attack. Debtor has little to lose and everything to gain by pursuing the Eleventh Circuit appeal, especially given that the opening appellate

brief is a sunk cost, and the remaining appellate work can be accomplished at no expense to Debtor.

The Trustee has not articulated any sound basis, and has not identified any compelling bankruptcy or non-bankruptcy reason, to abandon the appeal and sign off on a 90% settlement. And the Trustee certainly has not articulated a compelling basis for rushing to achieve this outcome now, without allowing sufficient time for full consideration of the various factors and developments that might shape Debtor's options and leverage with respect to the adverse $6.2 million judgment. In spite of this, the Bankruptcy Court granted the Trustee's motion to approve the Proposed Settlement disposing of the appeal, saddling the estate with the obligation to pay millions of dollars. This Court should overturn the Bankruptcy Court's error.

## STATEMENT OF JURISDICTION AND STANDARD OF REVIEW

This Court has appellate jurisdiction under 28 U.S.C. § 158(a) over the Order. This appeal is timely filed. The Bankruptcy Court granted approved the Proposed Settlement on September 20, 2023. On September 21, 2023, Appellants filed a notice of appeal. In exercising its appellate review, this Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Env't Energy, Inc.)*, 188 F.3d 116, 122 (3d Cir. 1999). In the case of mixed questions of law and fact, this Court "exercise[s] plenary review of the trial court's

choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Haskell v. Goldman, Sachs & Co.* (*In* re *Genesis Health Ventures, Inc.*)*, 34*0 B.R. 729, 732 (D. Del. 2006) (citation omitted).

## STATEMENT OF ISSUES

1.      Whether the Members have standing to object to the 9019 Motion because of their significant economic interest in, and the adverse impact they face from, the Proposed Settlement, according to *In re RFE Indus., Inc.*, 283 F.3d 159, 164 (3d Cir. 2002).

2.      Whether, under the factors set forth in *In re Martin*, 91 F.3d 389 (3d Cir. 1996), the Bankruptcy Court erred in approving the Proposed Settlement as fair and equitable to the estate under Rule 9019, where the Debtor's pending Eleventh Circuit appeal offers multiple avenues to overturn the judgment that led to this bankruptcy proceeding.

3.      Whether the Bankruptcy Court erred in approving the Proposed Settlement as fair and equitable to the estate under Rule 9019, where the interests of other parties favor the resolution of Debtor's already-commenced appeal of the judgment that led to this bankruptcy proceeding, meaning that the Trustee and Judgment Creditors have failed to satisfy the test set forth in *In re Martin*, 91 F.3d 389 (3d Cir. 1996).

## STATEMENT OF THE CASE

## I.    Relevant Background

The origin of this chapter 7 case is litigation resulting in a judgment against the Debtor in the amount of approximately $6.2 million (the "Judgment"). On or about December 29, 2021, the Debtor commenced an appeal of that Judgment in the United States Court of Appeals for the Eleventh Circuit (Case No. 21-13662) (the "Appeal"), asserting several grounds to reverse the Judgment. The substance of the Debtor's Appeal is discussed more fully below, with the discussion drawn from the December 29, 2021 Eleventh Circuit brief filed by TSI. A copy of the appeal brief ("TSI 11th Cir. Br.") is attached hereto as (A000170 – A000247).

On January 18, 2022, the Debtor commenced its voluntary case under Chapter 11 of the Bankruptcy Code. The Debtor's chapter 11 case never had the chance to get off the ground. Shortly after the Petition Date, Debtor's counsel abruptly withdrew leaving the Debtor without counsel for several weeks at a critical juncture in its case.

On March 31, 2022, following a hearing on dismissal or conversion of the case, an order was entered converting the case from chapter 11 to chapter 7. George L. Miller (the "Trustee") was appointed as the interim chapter 7 trustee.

On April 27, 2022, the Judgment Creditors each filed a proof of claim premised on the judgment, seeking an aggregate amount of approximately $6.2 million.

In connection with his appointment, the Trustee commented on the pending Appeal, the Judgment, and the Judgment Creditors' proofs of claim. The Trustee acknowledged that "prosecution of the Appeal may be in the best interests of the other creditors," *see* Bankr. D.I. 177 at ¶ 28, (A003115 – A003142), and noted that "[i]f the Debtor's arguments in the Appeal are successful, the Debtor actually overpaid [Judgment Creditors] by at least $95,032 and would have an affirmative claim against them to recover such overpayment[,]" *id.* at ¶ 31.

In fact, in connection with a disputed trustee election in this chapter 7 case, the Trustee objected to the claims asserted by the Judgment Creditors and represented to the Court that the Judgement Creditors held "disputed" claims "as to both liability and amount" that are subject to a "compelling" appeal. *See* Bankr. D.I. 164 at ¶ 8, (A003143 – A003224) ("By the Appeal, the Debtor continues to dispute both the Debtor's liability on, and the amount of, the Judgments on various grounds. . . . The Opening Brief [filed in the Appeal] details the Debtor's various disputes with respect to the Judgments and the Trustee incorporates the Opening Brief into this Preliminary Objection by reference."); *see* Transcript of June 15, 2022 Hearing, at 55: 4-16 (A000103) (The Trustee testified that he "think[s] [the Appeal] has merit,"

and "absolutely" agree that issues on appeal should be further explored "because the mistakes are so large, you know, we're talking several million dollars."); Bankr. D.I. at 177 at ¶ 29 (A003124) ("Despite the [Judgment Creditors'] efforts to undermine the arguments raised by the Debtor in the Appeal and Opening Brief, the Appeal is compelling").

After initially twice describing the Appeal as "compelling," confirming a dispute as to "the Debtor's liability on, and the amount of, the Judgments on various grounds," and characterizing the Judgment as premised on "mistakes . . . so large, you know, we're talking several million dollars," the Trustee has purposefully ignored the Appeal to date. Despite repeated urging by the Members, the Trustee has never sought to lift the stay of the Appeal or otherwise take any steps to prosecute the Appeal. As is set forth below, the Trustee also rejected, on spurious grounds, repeated offers by the Members to fund the Appeal.

The Trustee's administration of this Estate has followed a path markedly different from the path he initially articulated. Rather than contemporaneously seeking to reduce the aggregate amount of claims asserted against the Estate by, among other things, moving forward with the Appeal, and seeking to file claims and collect receivables to monetize existing property of the Estate, the Trustee's focus has been entirely on preparing and prosecuting litigation including seeking injunctive relief against the Members, among others.

In or around June, 2023, the Members learned publicly available information indicating that the Federal Emergency Management Agency ("FEMA") was preparing to pay the Debtor on a claim worth approximately $13.5 million. Presumably, the Trustee was privy to the same information.

On July 21, 2023, the Trustee filed the Motion. The Motion disclosed that the Trustee and the Judgment Creditors "have agreed to resolve the Judgment Creditors' proofs of claim and the Eleventh Circuit Appeal" on terms set forth in the Proposed Settlement. Those terms include the Estate's payment to the Judgment Creditors, collectively, in the amount of approximately $5.6 million. This represents payment to the Judgment Creditors of approximately 90% of their claims.

The Trustee's Motion contains no explanation for the timing of the Proposed Settlement or justification for paying the Judgment Creditors 90% of their claims. Circumstances support the conclusion that the Trustee believed a significant FEMA payment was imminent and wanted to quickly pay the Judgment Creditors nearly in full on their claims, both to reduce amounts distributed to the Members at the conclusion of this solvent chapter 7 case and to hold that amount out as justification for the Trustee's continued prosecution of the Adversary Proceeding against the Members. Again, the same Trustee that twice characterized the Appeal as compelling and the Judgment as premised on significant "mistakes" subsequently proposed abandoning the Appeal and paying the Judgment nearly in full.

Whatever his motivations, the Trustee's Motion offered the Bankruptcy Court only patently incorrect reasoning and conclusory platitudes to justify the Proposed Settlement. None of the factors the Bankruptcy Court was required to consider regarding the Motion suggested that approval of the Proposed Settlement, either at that time or now, is in the Estate's best interest. Accordingly, the Motion should have been denied (or deferred) and the Members' Objection should have been sustained.

Instead, the Bankruptcy Court granted the Motion and approved the Proposed Settlement on September 20, 2023. The Bankruptcy Court's Order did not provide any substantive basis for its decision, merely stating that the Bankruptcy Court "determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein." Bankr. D.I. 367 (A000717).

On September 21, 2023, Appellants filed a notice of appeal (the "Appeal") from the Order. Bankr. D.I. 370 (A003225 – A003228.)

## SUMMARY OF THE ARGUMENT

The Trustee has sought approval of a settlement under which the Debtor (TSI) would abandon a pending Eleventh Circuit appeal of a Florida District Court judgment in which a jury awarded $6.2 million to the Judgment Creditors. In return, the Debtor's Estate would receive a paltry 10% reduction in the overall judgment

amount. The reasonableness of this deal would be questionable under almost any circumstance, but it is particularly so here.

The Members' objections to the Trustee's proposed settlement are governed by a multi-factor framework set out in *In re Martin*, 91 F.3d 389 (3d Cir. 1996). On the first factor, the probability of success for the Estate should it continue the litigation, TSI has strong arguments in its Eleventh Circuit appeal. There are strong grounds for believing the District Court lacked subject matter jurisdiction in this diversity case. At least one of the Judgment Creditors is a citizen of California, and evidence presented to the District Court before trial established that Steven Acosta, a California citizen, accepted the offer of membership in the Debtor eight months before the Judgment Creditors filed suit, under an oral vote that was permissibly deemed proper by TSI's members under the terms of the company's management agreement. On this record, the Judgment Creditors did not meet their burden of proving that the District Court properly exercised jurisdiction over their claims against TSI.

TSI's Eleventh Circuit appeal contains other strong arguments as well. Based upon the evidence presented at trial, including the Judgment Creditors' own characterizations of their alleged agreement with TSI, it appears the jury's verdict is founded upon what would in fact be an unlawful agreement promising a contingent fee tied to the award of a federal contract. The jury was not given the opportunity to

pass on this allegation of illegality, but that has no effect on the appeal, because the Eleventh Circuit (and all federal courts) have a continuing obligation to assess the legality of the agreements they are asked to enforce, and to strike down as void alleged contractual agreements containing terms prohibited by federal law.

TSI's appellate arguments also challenge the District Court's rulings that allowed TSI's commission obligations to expand well beyond the parameters of the limited written agreement between TSI and the Judgment Creditors. In doing so, the District Court misapplied or ignored core principles of Florida contract law, and acted on predicate assumptions that are contradicted by the underlying record evidence. Success on any of these issues would either eliminate the Judgment Creditors' claims as a matter of law, or at a minimum substantially reduce the upper-bound of any potential recovery they could seek in hypothetical post-remand litigation.

The other applicable *Martin* factors also support the Members' objections to the proposed settlement. The opening brief in the Eleventh Circuit has already been filed, and the Members have made unequivocally clear that they are willing to foot the bill for the limited appellate effort that remains – a reply brief, and potential oral argument. There are also options the Trustee has failed adequately to consider in connection with the expense of potential remand litigation, and the Trustee and the Bankruptcy Court appeal to have failed entirely to consider a core element of the

Members' objections – namely, that compared to the status quo, the leverage and bargaining power of the Judgment Creditors would be substantially reduced in any conceivable remand scenario, meaning the Trustee would at a minimum have a far higher probability of obtaining a more favorable settlement in that setting.

For these reasons, and taking into account the overall interests of the various persons and companies involved in this dispute, the Trustee has fallen well short of establishing any reasonable grounds for the decision to abandon the Eleventh Circuit appeal, in a favor of a settlement that pays the Judgment Creditors 90% of the maximum amount they could ever conceivably hope to recover. On this record, the Members' objections should be sustained, and the Trustee's motion seeking approval of his ill-conceived settlement pursuant to Bankruptcy Rule 9019 should be denied.

## ARGUMENT

## I.    The Members Have Standing to Object to the 9019 Motion

Because the Trustee challenged the Members' standing before the Bankruptcy Court to take certain actions, we address the threshold issue of the Members' standing to object to the Proposed Settlement.

The Members have a significant economic interest in, and are adversely affected by, the Proposed Settlement. The Members have standing because the relief requested by the 9019 Motion greatly affects their individual economic and other rights. The Members are the residual stakeholders in what they maintain is a solvent

chapter 7 estate. Assuming receipt of the $13.5 million from FEMA (which may be as high as $15.5 million pursuant to the Prompt Payment Act), the Trustee is actually paying the Judgement Creditors with non-estate money; *i.e.*, money that otherwise should be paid to the Members. *See In re Remsen Partners, Ltd.*, 294 B.R. 557, (S.D.N.Y. 2003) (non-creditor law firm was "aggrieved" and had standing to object to settlement where it would have the "chance to have an allowed claims" if the settlement was disapproved and "will have little or no recovery if the settlement is approved"); *In re RFE Indus., Inc.*, 283 F.3d 159, 164 (3d Cir. 2002) (debtor had standing to object to proposed settlement where it was "clearly adversely affected by the Settlement").

The Proposed Settlement also unnecessarily and adversely affects the Members' individual interests in other ways. Specifically, the Members are adversely affected by the Trustee validating the claims of the Judgement Creditors by paying those claims nearly in full. The Debtor had, and post–chapter 7 will continue to have, a viable business which the Members will own and intend to operate. Indeed, during the pendency of this chapter 7 case, the Defense Logistics Agency alone has offered the Debtor over 1,000 opportunities to bid on fuel fulfillment contracts.[2] As is set forth more fully below, the Judgment represents an

---

[2] The Members offered to fund the Appeal because they believe the District Court judgment is unlawful and should be reversed, and also because they wanted

illegal commission payment that the Debtor is barred from paying by applicable statutes and regulations. Abandoning the appeal and acquiescing to paying a substantial settlement amount in relation to the Judgment Creditors' claims may be unfavorably viewed by federal agencies as reflecting prior entry into an unlawful contingent fee agreement by Debtor. That could (a) undermine the ability of the Debtor and the Members to continue securing government contracts after this chapter 7 case closes, and (b) independently place at risk prior and anticipated future payments by FEMA under contracts already fully performed by the Debtor.

The Members also have standing because they are creditors of the Debtor. As defendants in an Adversary Proceeding commenced by the Trustee, they have potential §502(h) claims. A contingent claim falls within the broad definition of claim at §101(5). They also have a claim against the Trustee, his counsel, and the estate for substantial financial loss if the *6 Year SOL* expires on the Trustee's watch, because the Trustee failed to properly investigate and file claims for the "Alleged A/R."[3] These are claims either under §323(b)[4] or within the meaning of §101(5)(B) ("right to an equitable remedy for breach of performance if such breach gives rise to

---

to ensure that, in the event of a settlement, the settlement is structured so that the judgment is withdrawn to avoid prejudice to the Debtor going forward.

[3] Unlike ordinary trade receivables, government receivables may increase in value over time due to the Prompt Payment Act and the Members reserve all rights.

[4] The Members reserve all rights, including under the *Barton* doctrine.

a right to payment . . . ."). The Bankruptcy Court also afforded the Members standing to object to the Trustee's counsel's interim fee application and the Members similarly have standing here.

Finally, the Trustee acknowledged the Members' standing to make this Objection by serving notice of the Motion upon counsel representing the Members. Rule 9019(a) directs that any motion under Rule 9019 must be served upon "creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." The Members' counsel does not represent any of the parties specified in Rule 9019(a). By providing notice of the Motion to the Members' counsel, the Trustee acknowledged that the Members have an interest in the outcome of the Motion, and therefore had standing to make the Objection.

## II.    <u>Legal Standards Applicable to the Trustee's Motion</u>

The legal standards applicable to the Motion are not contested. The Third Circuit established those standards in *In re Martin*, 91 F.3d 389 (3d Cir. 1996), and articulated four factors to consider when evaluating approval of a settlement under Rule 9019. Those factors are: (1) probability of success in litigation, (2) the likely difficulties in collection, (3) the complexity of the underlying litigation, and the expense, inconvenience and delay necessarily attendant to it, (4) the paramount

interests of the creditors. *See In re RFE Indus., Inc.*, 283 F.3d 159, 165 (3d Cir. 2002) (*citing Martin*).

While the Bankruptcy Court need not conduct a mini-trial in evaluating the *Martin* factors, it is required to "examine[] the Settlement under the *Martin* framework" and make findings of fact for the grant or denial of requested approval of a settlement. *Id*. Indeed, determination of a Rule 9019 motion "requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *In re Diocese of Camden, N.J.*, Case No. 20-21257 (JNP), 653 B.R. 722, 735 (D.N.J Aug. 29, 2023) (quoting *Martin*).

Here, the Proposed Settlement addressed a claim *against* the Debtor, and therefore the second *Martin* factor, the likely difficulties in collecting on a claim, is not relevant. As is set forth below, each of the other three *Martin* factors weigh against approving the Proposed Settlement.

**III.    The Bankruptcy Court Should Not Have Approved the Settlement**

**A.    Probability of Success**

The first *Martin* factor considers the Debtor's probability of success in the Appeal and subsequent proceedings, if any.

1.   **The Debtor Has Articulated Numerous Bases on Which the Judgment that Led to this Bankruptcy May be Overturned**

The TSI Eleventh Circuit brief articulates multiple grounds to overturn the Judgment, including:

### a.   *Unlawful contingent commission agreement*

It is illegal under federal law for the Judgment Creditors to be paid a contingent percentage commission for merely securing a government contract. *See* 41 U.S.C. § 3901(b)(1) (the federal statute prohibits any person from "secur[ing] the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee...."); *see also* Federal Acquisition Regulation ("FAR") 52.203-5(a), which was specifically incorporated into FEMA's Request for Proposal and MATOC (similarly prohibits such contingent fees, defined as "any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.").

The Debtor should have been allowed to amend its Affirmative Defenses in the underlying litigation to include a defense of Illegal Contract, in violation of 41 U.S.C. § 3901(b)(1) and FAR 52.2035, because the Judgment Creditors advocated interpreting the Consulting Agreement in a way that makes it illegal and unenforceable under federal law by claiming a commission for merely helping the

Debtor secure a FEMA contract.[5] Instead, the District Court Judge, relying on a recollection of testimony, denied the Debtor's request to amend its Affirmative Defenses. TSI 11th Cir. Br. at 19-20 (A000203 – A000204.) The illegal nature of the contract advocated by Judgment Creditors was never before the jury. *Id.* at 20. (A000204). In other words, because the Debtor was not permitted to amend its Affirmative Defenses, the jury was not asked to determine whether there was an illegal contract, and never made that determination.

The Bankruptcy Court discounted this argument because it believed the Florida trial evidence had shown that the Members did not *intend* to enter an unlawful contingent fee agreement, and had rejected proposed language that would have required payment of a commission. 9019 Hearing Tr. (Sept. 20, 2023) at 102-03 (A003326). But this makes little sense as grounds for questioning the likely success of TSI's Eleventh Circuit appeal, for several reasons.

First, the verdict in favor of the Judgment Creditors was not based strictly on the written agreement, but rather on the District Court's finding that the parties (TSI

---

[5] *See, e.g.,* Transcript of Judgment Creditor Testimony on August 24, 2021 at 201:25-202:20 (A002675 – A002676) (advocating that Judgment Creditors' introducing the Debtor to the office holding the Multiple Award Task Order Contract entitles Judgment Creditors to a 25% fee "[u]nder that MATOC or any other governmental contracts"); Transcript of Judgment Creditors' Argument on August 23, 2021 at 43:19-47:04 (A002515 – A002519) (arguing that because of Judgment Creditors' efforts to secure the Debtor's contract with the government, Judgment Creditors are entitled to "25 percent of the net income").

and the Judgment Creditors) had entered into an agreement with ambiguous terms, and that these terms could be interpreted or modified through conduct and oral discussions to encompass what amounted to a sweeping contingent commission fee in favor of the Judgment Creditors. TSI's Eleventh Circuit appeal points out that this alleged interpretation, as articulated by the Judgment Creditors' own trial witnesses, suggested a deal in which TSI was obliged to pay Judgment Creditors a specified percentage of contract revenue if TSI was actually awarded a federal contract by FEMA, without any further work required of the Judgment Creditors. In other words, an illegal contingent fee agreement.

It was this alleged agreement that underlies both the jury's damages award in favor of the Judgment Creditors, and TSI's Eleventh Circuit argument that the Judgment Creditors were de facto seeking to be paid under a contingent commission arrangement that is prohibited by federal law. Given this backdrop, the Bankruptcy Court was wrong to suggest that TSI's initial refusal to embrace an express contingent commission agreement somehow contradicts or undermines its Eleventh Circuit challenge to the illegality of the contract theory on which the Florida jury verdict depends.

Second, the Bankruptcy Court's focus on drafting history and TSI's subjective intent is misplaced, because under both Eleventh Circuit and Florida law, each court asked to enforce a contract has an independent judicial duty to evaluate whether the

alleged agreement is illegal or contrary to public policy. *I.U.B.A.C. Loc. Union No. 31 v. Anastasi Bros. Corp.*, 600 F. Supp. 92, 94-95 (S.D. Fla. 1984) (quoting *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83-84 (1982)) ("[F]ederal courts have a duty to determine whether a contract violates federal law and must reach the merits of an illegality defense *before* enforcing a contract. . . . [A] party cannot waive the defense of illegality of the contract. The Court itself is bound to raise the issue *sua sponte.*"); *Neiman v. Provident Life & Accident Ins. Co.*, 217 F. Supp. 2d 1281, 1286 (S.D. Fla. 2002) ("Under Florida law, a contract that violates public policy is void and unenforceable."); *Quinn v. Gulf & W. Corp.*, 644 F.2d 89, 92 (2d Cir. 1981) ("It is well established that a contract between private parties for a contingent fee, in violation of Federal Procurement Regulations, will not be enforced.").

Federal courts have applied this general principle in the specific context of the regulatory prohibition against contingent fees tied to award of a federal contract, refusing to enforce such agreements on the ground that they are against public policy and prohibited by federal law. *CapitalKeys, LLC v. CIBER, Inc.*, 875 F. Supp. 2d 59, 63 (D.D.C. 2012) (quoting *Providence Tool Co. v. Norris,* 69 U.S. (2 Wall.) 45, 55 (1864)) ("Since 1864, the Supreme Court has held that the payment of contingent fees to third parties for the purpose of securing government contracts or sales violates public policy. . . . 'The law meets the suggestion of evil, and strikes down the contract from its inception.'"); *see* 41 U.S.C. § 3901 ("Every contract awarded after

using procedures other than sealed-bid procedures shall contain a suitable warranty, as determined by the agency head, by the contractor that no person or selling agency has been employed or retained to solicit or secure the contract on an agreement or understanding for a commission, percentage, brokerage, or contingent fee, except for bona fide employees or bona fide established commercial or selling agencies the contractor maintains to secure business.").

Thus, if the Eleventh Circuit were to conclude the Judgment Creditors were seeking enforcement of an unlawful contingent commission agreement tied to the award of a federal contract, it would likely reverse the District Court and vacate the jury's verdict in favor of the Judgment Creditors. This result would attach without regard to the subjective intent of TSI and the Judgment Creditors, and would not be affected by any dispute concerning whether TSI timely raised the issue of contract illegality at trial. *See I.U.B.A.C.*, 600 F. Supp. at 94-95 ("[F]ederal courts have a duty to determine whether a contract violates federal law and must reach the merits of an illegality defense *before* enforcing a contract. . . . [A] party cannot waive the defense of illegality of the contract. The Court itself is bound to raise the issue *sua sponte*.").

The bottom line is that (a) the theory on which the Judgment Creditors relied at trial has all the hallmarks of a contingent commission agreement prohibited under federal law, and (b) the Eleventh Circuit will likely strike down or void any alleged contract terms found to be illegal or contrary to public policy. An appellate victory

on this ground would end the case and would not require a new trial. Neither the Trustee nor the Bankruptcy Court articulated a coherent basis for discounting the likely success of this argument, and thus the Bankruptcy Court's order approving the Trustee's ill-conceived 90% settlement proposal cannot stand.

### b.    *Lack of subject matter jurisdiction in the District Court*

TSI's Eleventh Circuit appeal argues persuasively that the Florida litigation should have been dismissed for lack of subject matter jurisdiction because Judgment Creditors failed to prove complete diversity of citizenship. There are citizens of California on both sides, and the Debtor's Operating Agreement was correctly amended by vote to add a California resident as a member, *eight months* before the Judgment Creditors filed suit. (TSI 11th Cir. Br. at 16, A000200.) The district court focused on an inapposite technicality regarding an LLC membership resolution to reject the amendment, but acknowledged the "significant possibility" that it did not have jurisdiction. (TSI 11th Cir. Br. at 15, A001176 – A000199.)

The Bankruptcy Court, in approving the Trustee's proposed settlement, questioned the efficacy of TSI's jurisdictional challenge. The Bankruptcy Court reasoned that the District Court had found an LLC membership form – proffered by TSI at trial as having added a California member to the company – to likely have been created after the jurisdictional issue in the District Court arose (and thus inauthentic). 9019 Hearing Tr. (Sept. 20, 2023) at 102-03 (A000828 – A000828).

This rationale however – the only one proffered by the Bankruptcy Court – improperly ignores TSI's actual jurisdictional argument in the Eleventh Circuit. TSI's appellate brief argues that (1) the plaintiffs in the District Court (the Judgment Creditors) bore the burden of proving through evidence a proper basis for the District Court's subject matter jurisdiction; (2) it was undisputed that plaintiff George Peterson was a California citizen; (3) California citizen Steve Acosta was a member of TSI, having accepted membership seven months before Plaintiffs/Judgment Creditors had filed suit. TSI correctly noted that its membership agreement did not require a written resolution as a precondition to adding a member, instead simply contemplating a procedure "acceptable to the Management Committee." (TSI 11th Cir. Br. at 13 (A000197). TSI's appeal brief further noted that the effective date of Acosta's membership was not arbitrary – it coincided with this appointment as Facility Security Officer ("FSO") for TSI, a position for which he was required by federal regulation to be a member or company employee. *Id.* at 13-14 (A000197 – A000198).

TSI's appeal brief summarized the other actions by the other Members and by Acosta corroborating his status as a member of the company circa February 2018, such as his appointment to the management committee along three other members, and his receipt of payments as a member via K-1 distributions. *Id.* at 15 (A000199). Acosta also testified unequivocally in the District Court proceedings that he was

voted in as a member via the oral vote of the other members, and there does not appear to be any dispute that TSI's LLC Operating Agreement did not require a signed, written agreement or a signed resolution before membership could be effective. *Id.* at 16 (A000200).

Per TSI's Eleventh Circuit brief, that Court has emphasized the continuing duty of district courts to "zealously ensure that jurisdiction exists over a case":

> [The district court] should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises. A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does not exist arises."

TSI 11th Cir. Br. at 16 (A000200) (quoting *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). Aware of this duty, the Florida District Court acknowledged, based on the points outlined and summarized above, that "there is at least a significant possibility that the Eleventh Circuit will say I got it wrong; there's no federal jurisdiction." TSI 11th Cir. Br. Appx. (Fla. Dkt., ECF 57 at 18) (A001498).

On this record, it is clear TSI has a substantial chance at victory in the Eleventh Circuit on its challenge to the Florida District Court's subject matter jurisdiction. The Bankruptcy Court's perfunctory dismissal of this issue, on a basis (the lack of a contemporaneous written membership resolution for Acosta) that fails to engage the actual arguments at issue in the Eleventh Circuit, does not pass muster as fulfilling the Bankruptcy Court's duties under the first *Martin* factor.

### c.    Limitation of commissions to Niagara-brand bottled water

TSI's Eleventh Circuit appeal also challenges the Florida District Court's willingness to allow the jury to move beyond the plain language of the written contract between TSI and the Judgment Creditors, and graft in additional commissions for Nestle water through alleged "modifications" via oral discussions or conduct. But commissions under the Consulting Agreement are expressly limited to sales of Niagara-brand bottled water. The Consulting Agreement prohibits any modification unless in writing and signed by all parties. (TSI 11th Cir. Br. at 21 (A000205).) The Florida court misapplied a rare legal exception to allow an oral or implied modification in spite of that clause, and there was insufficient evidence to support any modification. (*Id.* at 21-28 (A000205 – A000212).)

TSI's Eleventh Circuit brief notes that the written agreement between TSI and the Judgment Creditors contained a strong integration clause, under which "any amendment and/or modification or change in terms of this Agreement shall only be effective if in writing and signed by all of the Parties hereto" and "any other understandings and/or agreements not set forth herein are of no force or effect whatsoever." TSI 11th Cir. Br. at 21 (A000205). The TSI appeal brief also properly emphasizes the heavy burden Judgment Creditors should have been required to bear in order to override this clause and demand payment of commissions for Nestle-branded water not mentioned in the Agreement. *Id.* at 22-23 (A000205 - A000206).

Indeed, the Eleventh Circuit requires parties making a "modified by conduct" argument to prove "by *clear and unequivocal evidence* [] a mutual agreement" to modify the contract. *See Energy Smart Indus., LLC v. Morning Views Hotels-Beverly Hills, LLC*, 660 F. App'x 859, 864 (11th Cir. 2016) (rejecting alleged "modification by conduct" where proponent of alleged modification failed to introduce evidence meeting the "clear and unequivocal" standard). This rule is reinforced by Florida law under which alleged "modification by conduct" of a written contract containing an integration clause will only be entertained where the alleged modification was "accepted and acted upon by the parties in such a manner as would work a fraud on either party to refuse to enforce it." *See Okeechobee Resorts, L.L.C. v. E Z Cash Pawn, Inc.*, 145 So.3d 989, 993 (Fla. 4th DCA 2014).

The TSI appeal brief also sets forth additional arguments challenging the Florida District Court's improper extension of the contract commission clause to reach Nestle-brand water, explaining that Florida law generally prohibits implied "conduct modifications" that would contradict or undermine the express terms of a written or unambiguous contract. TSI 11th Cir. Br. at 25-26, A000209 – A000210. The contract provision at issue allowed a 25% commission on "bottled water supplied by Niagara Bottling, LLC," and per TSI's appellate arguments, this term contained no ambiguity that would open the door to oral or conduct-based modifications contradicting the integration clause in the written agreement. *See id.*

TSI's appeal brief also summarized the record evidence from Judgment Creditors showing that all parties understood the original agreement had not been modified in the way the Judgment Creditors alleged, even many months *after* the text exchanges that were cited by the Florida District Court as evidence of the purported modification. *See id.* at 27-28, (A000211 – A000212). Instead, there was a separate oral agreement to allow Simons (acting through Judgment Creditor Simons Exploration Inc.) an additional 12.5% commission on profits from bottled water procured through Nestle. There was no dispute that Simons received this 12.5% commission.

Finally, TSI's appeal brief noted that the Judgment Creditors' arguments in favor of a broader alleged "modification" expanding commission payments could not support the verdict below. The communications invoked by Judgment Creditors on this issue did not involve Judgment Creditor Peterson or his company, GPDEV, LLC. *Id.* at 28, (A000212). Instead, the only person due a limited commission for Nestle water under this theory should have been Mr. Simons (of Simons Exploration Inc.), and Simons (as previously noted) had already been paid. *See id.* The net effect of the District Court's errors was to take a limited arrangement for percentage-based commissions between specific parties in relation to specific brands of water, and improperly transform it into a sweeping (and unlawful) contingent commission deal under which the Judgment Creditors were somehow collectively allowed to claim

entitlement to 25% of TSI's entire net profit under its Hurricane Maria FEMA contract, including profit on logistics work that had no connection whatsoever to Judgment Creditors or to their alleged efforts on TSI's behalf.

All of this is laid out in TSI's Eleventh Circuit appeal brief. None of this is addressed or even referenced in the Bankruptcy Court's oral ruling denying the Members' object to the Trustee's proposed settlement. Indeed, the Bankruptcy Court appears to have ignored this issue entirely, skipping over it when discussing the likelihood of success on appellate issues, and jumping immediately from a discussion of the "contract illegality" issue to the issue of whether the commission provisions in the written contract between TSI and the Judgment Creditors had been modified to encompass commission on FEMA rental payments for drop containers. *See* 9019 Hearing Tr. (Sept. 20, 2023) at 102-03 (A000828 – A000829).

Without having addressed this issue, the Bankruptcy Court by definition cannot have carried out its duty under the first *Martin* factor of properly evaluating TSI's likelihood of appellate success. Nor did the Trustee supply any independent evidence suggesting a proper evaluation of this issue. And if TSI's appeal were successful on this point, it would establish as a matter of law that Judgment Creditors were not entitled to additional commission on sales of Nestle-brand water under TSI's FEMA contract, meaning (at least as to this issue) there would be nothing left to remand to the Florida District Court.

### d.    No commissions on drop containers

TSI's Eleventh Circuit appeal brief also challenged the Florida District Court's decision to admit and rely upon parol evidence as grounds for allowing the jury to consider and conclude that Judgment Creditors were entitled to a commission arising from contract revenues attributable to FEMA's rental of drop containers from TSI. *See* TSI 11th Cir. Br. at 29-39 (A000213 – A000223). These arguments (which occupy ten pages in TSI's appeal brief) need not be restated here. For present purposes, it is enough to note that neither the Trustee nor the Bankruptcy Court, in the hearing below, gave any indication of even being aware of the various elements of TSI's appellate challenge on this score, much less of offering sound reasons for rejecting out of hands the potential for appellate success.

Indeed, the Trustee's testimony offered nothing specific at all. As to the Bankruptcy Court, its sole observation on this point was limited to expressing its agreement with the Florida District Court that a commission provision in the TSI-Judgment Creditors written agreement was ambiguous. 9019 Hearing Tr. (Sept. 20, 2023) at 103 (A000829). But a conclusory expression of agreement with the Florida District Court in this context begs the question, when measured against TSI's detailed appellate analysis that (a) mustered detailed legal and factual support (including points drawn from the drafting history and negotiations) for the proposition that the provision in question was *not* ambiguous, and (b) explained at

length why, even if the language of the commission provision could be deemed ambiguous, the facts, circumstances, and timing of TSI's work under the FEMA contract proved that any ambiguity could *not* reasonably extend so as far as to confer commission payments on Judgment Creditors arising from FEMA drop container rental revenue that could not have been contemplated by the parties at the time their original written agreement was made. TSI 11th Cir. Br. at 33-39 (A000217 – A000223). The failure of the Trustee and the Bankruptcy Court to acknowledge or even mention these appellate arguments, much less engage with them in a meaningful way, confirms that the Bankruptcy Court erred as a matter of law when applying the first prong of the *Martin* test and denying the Members' objection to the Trustee's ill-conceived 90% settlement.

### e.    *Inflated damages and improper pre-judgment interest*

TSI's Eleventh Circuit appeal also includes challenges to elements of the Florida District Court's rulings with respect to damages and pre-judgment interest. Assuming arguendo that Judgement Creditors are entitled to any amount, the amounts in the Judgment are erroneous. They were based on a summary by Judgment Creditors' expert that erroneously excluded over $1 million of expenses paid to Coakley Logistics for transporting the water to Puerto Rico and over $1 million of expenses related to Bering Straits. *Id.* at 40-43 (A000224 – A000227).

Similarly, TSI contends in the Eleventh Circuit that the award of $991,498.78 of prejudgment interest should be reversed. The Debtor showed that only post-judgment interest should apply or that any pre-judgment interest should accrue from the date of the verdict. *Id.* at 44-47 (A000228 – A000231). These additional arguments provide further evidence that on balance, the Trustee lacked a reasonable basis for abandoning the Eleventh Circuit appeal in favor of a settlement that would give Judgment Creditors 90% of what they would get on their best day – i.e., if every single element of TSI's appeal were to be rejected by the Eleventh Circuit. Nothing in the Trustee's analysis or the Bankruptcy Court's reasoning comes even close to suggesting that such an implausible result is likely.

Significantly, reversal on any one of several grounds set forth above would not result in a new trial, but instead would dispose of, or significantly reduce, the Florida Judgments as a matter of law. Thus, the Judgment would be dismissed as a matter of law, without the need for further proceedings, if the Eleventh Circuit finds that it is unlawful as a matter of law for the Judgment Creditors to have received a percentage commission for merely securing a government contract; or that the Florida Litigation should have been dismissed for lack of subject matter jurisdiction; or that the underlying contract could not have been modified, by its own terms; or that the underlying contract unambiguously provides for payments only for "bottled water." The Judgment also can be reduced, as a matter of law and without the need

for further proceedings, if the Eleventh Circuit finds that the judgment amounts are erroneous because they were based on improper expert testimony or finds that pre-judgment interest was granted inappropriately.

### 2. The Trustee Failed to Articulate Any Valid Reason to Believe that the Appeal Is Unlikely to Succeed

The Trustee gave the Bankruptcy Court no valid reason to conclude that the Appeal is unlikely to succeed. Instead, the Trustee (a non-attorney) offered only conclusory, unexplained assertions concerning whether he believed the Eleventh Circuit appeal could succeed on the merits. There is little that needs to be said here, as the Trustee's testimony at the 9019 hearing offers little with which to engage. Indeed, the Trustee himself never appears to have had a direct conversation with TSI's Eleventh Circuit appellate counsel for the purpose of walking through each of the appeal issues, understanding the rationale for TSI's appellate challenges, and making an informed decision as to whether (at no expense to the Estate) the Eleventh Circuit appeal should be pursued to a conclusion that could reduce by millions of dollars, or eliminate entirely, the Estate's exposure to the a deeply flawed $6.9 million judgment imposed by the Florida District Court.

Instead of offering valid reasons to criticize the Appeal, the Trustee repeatedly offers only conclusory, unsupported statements of his own assessment that the Appeal will fail and that the Proposed Settlement therefore is proper. While this Court and the Bankruptcy Court are not required to substitute their own judgment

for the Trustee' judgment, it is appropriate to make findings of fact concerning the probability of the Appeal's success. The merits of the Debtor's several grounds for Appeal are evident from the Debtor's Brief. Because the Trustee offers no valid reason to consider the Appeal unlikely to succeed, the first *Martin* factor weighs against approving the Proposed Settlement.

### B. The Already-Commenced Appeal Will Not Result in Complex or Expensive Litigation

The third *Martin* factor considers the complexity of the underlying litigation, and the expense, inconvenience, and delay necessarily attendant to it. None of those considerations warrants settlement with the Judgment Creditors now, by conceding 90% of the Judgment Creditors' claims.

The Appeal will not be, in itself, a complex or expensive undertaking. The Debtor already commenced the Appeal, including by filing a 63-page brief addressing all of the issues relevant to the Appeal. The remaining work for the Appeal consists of a reply brief and, presumably, oral argument. While we do not dismiss the seriousness of those tasks, the fact remains that the grounds for the Appeal have already been briefed in full, greatly reducing the complexity and expense of the Appeal going forward.

Additionally, the Appeal can be completed at no cost to the Estate. The Members repeatedly offered to fund the entire cost of prosecuting the Appeal (provided the Members retain sole authority to settle the Appeal), and that offer still

stands. The Trustee has refused to consider that offer or discuss it with Member's counsel, supposedly on the ground that the Bankruptcy Court's existing injunctions prevent the Members from paying for the Appeal. That is not a bona fide reason to dismiss the Members' offer. The parties can request modification of those injunctions to allow the Members to pay for the Debtor's Appeal. Whatever the actual reason for the Trustee's refusal to even consider the Member's offer, his proffered reason clearly is not it.

The Trustee raises the specter of "an expensive new trial" following the Appeal. But even the Trustee concedes that a new trial would arise only from two of the several grounds for the Debtor's Appeal. Trustee's Br. ¶23 (A000001 – A000026). While there is a chance that the Appeal will result in further District Court proceedings, that result is hardly inevitable. Should it arise, the Trustee can pursue a settlement reflecting risk and cost to both sides in proceeding further – and with the benefit of the Judgment being reversed in the meantime.

This latter point bears emphasis. Other than brief comments on the merits of certain of the Eleventh Circuit appeal issues, the Bankruptcy Court's only proffered rationale for approving the Trustee's proposed settlement was that the Trustee might reasonably have been concerned that success on appeal would lead to further litigation on remand, thus resulting in additional expense to the Estate. But this rationale makes little sense, for at least three reasons. First, as explained above, the

primary appellate arguments are ones on which, if TSI succeeded, all or meaningful parts of the Judgment Creditors' claims would be eliminated entirely *as a matter of law*, thus either eliminating any hypothetical "remand litigation," or drastically reducing the Estate's potential exposure vis-à-vis the same. Second, as the Members through counsel made clear in the Bankruptcy Court, they are willing not only to fund any remaining expenses associated with the Eleventh Circuit appeal, but also to collaborate with the Trustee on providing financial support (from various potential non-Debtor revenue sources) in order to defeat any remaining Judgment Creditor claims on remand. *See* 9019 Hearing Tr. (Sept. 20, 2023) at 90-91 (A000816 – A000817).

Third, and perhaps most important, the preoccupation with hypothetical remand litigation defies common sense, because the Trustee's current "settlement" was negotiated against a backdrop in which Judgment Creditors *are sitting on a District Court judgment worth $6.9 million*. Any appellate decision that resulted in a remand would, in the first instance, and by definition, put the Judgment Creditors in a far weaker and more uncertain position than they are now, facing far more downside, with a greatly reduced and/or much riskier upside. Neither the Trustee nor the Bankruptcy Court has offered any basis – much less proffered a sound or reasonable rationale – for believing that the Trustee in this posture would have to

pay anything remotely close to 90% of the pre-appeal judgment amount in order to reach a mutually-agreeable post-appeal settlement with the Judgment Creditors.

Given the present status of the Appeal, the significant possibility that the Appeal will not result in subsequent proceedings, and the Members' offer to fund the appeal, the third *Martin* factor weighs heavily against approval of the Proposed Settlement.

### C.   The Balancing of Interests as Between Interested Parties Favors the Resolution of TSI's Pending Eleventh Circuit Appeal

While the fourth *Martin* factor is the paramount interest of creditors, that factor is not limited only to the interests of creditors. Where, as here, the Debtor's owners have a substantial stake in the outcome of this bankruptcy case, consideration of the owners' interests "appears to be consistent with the purpose of the *Martin* test – to maximize the recovery of those to whom the [debtor] has obligations." *RFE*, 283 F.3d at 165.

### 1.   The Proposed Settlement Is Excessively Generous and Does Not Benefit the Debtor's Creditors or Members

The Proposed Settlement has no benefit to the Debtor's creditors or Members. The Trustee does not even pretend that there is any such benefit, and did not address this *Martin* factor in his Motion. The Bankruptcy Court's decision to approve the Proposed Settlement at this stage of the Bankruptcy proceeding does not advance the administration of the Estate, as no administrative step hinges on the Proposed

Settlement being approved. Neither is the Proposed Settlement so advantageous to the Estate that it must be approved now, or risk being lost forever. The Proposed Settlement saddles the Estate with the obligation to pay 90% of the Judgment. It is not a deal that is too good for the Estate to pass up. The Trustee gives this Court and gave the Bankruptcy Court no reason to determine that the Proposed Settlement is beneficial to the Debtor's creditors or Members, and instead offers only bromides and conclusory statements, without any substance.

On the other hand, an overly generous settlement of the Appeal and the Judgment harms the Members. The Proposed Settlement unjustifiably reduces the amount of money that will be available to the Members at the conclusion of this solvent chapter 7 case. That in and of itself causes the fourth *Martin* factor to weigh against approving the Proposed Settlement.

      **2.**    **The Proposed Settlement Risks May Disable the Debtor and Members from Competing for Future Federal Contracts by Facilitating an Unlawful Contingent Fee Arrangement**

Additionally, there is material risk that the Proposed Settlement will harm the Debtor and the Members' reputations and ability to secure future work from federal agencies. The Judgment Creditors' demands for payment are justifiably characterized as a commission, and the Judgment essentially provides for payment of that commission. The payment of a commission to the Judgment Creditors can therefore be perceived as the Debtor's payment – albeit through the Trustee – of an

unlawful commission arising from an unlawful contingent fee agreement. To the extent Debtor or its Members are perceived to have entered into such an agreement, or acquiesced to a contingent fee payment without exhausting every legal means of challenging it, it raises the risk of competitors or potential government customers challenging the eligibility of Debtor or its Members for future federal contracts, under the FAR provisions that limit contracting opportunities to "responsible" contractors (with "responsibility" deemed to include having a "satisfactory record of business ethics and integrity.") *See* FAR 9.103 and 9.014-1. The increased risk in the procurement process extends not only to the Debtor entity that the Members hope to maintain, but also to any current or future contracting entities in which the Members have an interest. *See, e.g.,* FAR 9.104-6 (establishing government database and look-back period for responsibility determination across affiliated companies) and FAR 9.403 (establishing that individuals and contractual affiliates are subject to suspension and debarment regulations). Even if such a challenge lacked merit, the uncertainty and expense involved in responding, and establishing a record of "present responsibility," would impose significant costs on the Members.

### 3. The Potentially Unlawful Contingent Fee Arrangement May Also Undermine the Federal Government's Willingness to Pay the Debtor's Receivables

For the same reasons, the Proposed Settlement could jeopardize governmental payment of the Debtor's receivables.

Governmental agencies can withhold or claw back payments to the Debtor if those agencies believe that the Debtor is using those payments in ways that violate regulations or statutes, including by paying an unlawful commission to the Judgment Creditors. At the very least, prosecution of the Appeal and continued dispute of the Judgment can only reassure governmental agencies that the Debtor is not seeking to use payments from the government to fund payment of an unlawful commission.

This point bears emphasis. The written consulting agreement between Debtor and the Judgment Creditors offered simply to compensate the Judgment Creditors for their role in procuring a supply of bottled water from one specific supplier in the event Debtor was able to sell this same supply of bottled water to upstream federal agency customers under one or more federal contracts. Such an arrangement is not unlawful. But in Judgment Creditors' case at trial, Judgment Creditors characterized the agreement differently, insisting they had been promised what they called a "success fee" consisting of a specified percentage of all net revenue under any ensuing FEMA task orders; without limitation in relation to the nature and scope of the work being performed by Debtor and its subcontractors for FEMA; and without the Judgment Creditors themselves actually performing any subcontract work (whether by arranging a supply of water, supporting delivery, or otherwise performing tasks within the scope of a FEMA contract or task order). *See* Debtor's Br. at 17-19 (A000043 – A000045).

In other words, under Judgment Creditors' interpretation of the original agreement – which surfaced after FEMA began awarding task orders under the FEMA contract – their only obligation was to help Debtor obtain or secure the award of a federal FEMA contract. And the only payment to be made by Debtor to Judgment Creditors for their services was (a) legally contingent upon Debtor successfully receiving the FEMA contract, and (b) calculated based upon a percentage of all revenue paid by FEMA for Debtors' work under the contract, rather than in relation to any actual support from Judgment Creditors in a subcontracting or teaming role.[6] *If the agreement were construed in this manner*, it would constitute an unlawful contingent fee agreement in violation of FAR subpart 3.402, under which payment by Debtor of a contingent fee would place at risk *all* of Debtor's past and anticipated future revenue under the pertinent FEMA contract and task orders.

By way of further explanation, FAR Subpart 3.402 establishes there is nothing wrong with Company A paying Company B to help Company A secure a government contract, *provided the obligation to pay Company B is not contingent upon Company A's success in obtaining or securing the contract.* The problem is one of incentives. "Contractors' arrangements to pay contingent fees for soliciting

---

[6] Again, such an interpretation is objectively unreasonable based on the actual language of the Consulting Agreement. A review of the relevant language in context makes clear that the agreement to provide a percentage of net revenue was limited to quantity supplied by Niagara.

or obtaining Government Contracts have long been considered contrary to public policy because such arrangements may lead to attempted or actual exercise of improper influence." *See* FAR 3.402 (citing 41 U.S.C. § 3901) (also cited in TSI 11th Cir. Br. at 18 (A000044). In furtherance of this policy, federal contractors are required to warrant that they have *not* entered into such an unlawful contingent fee agreement with any parties who may have assisted in soliciting, securing, or obtaining the contract. *See* FAR 3.402(a) (prescribing mandatory warranty against contingent fees) and FAR 52.203-5 (warranty clause disclaiming use of contingent fees, incorporated by reference or operation of law into all negotiated federal contracts).

The consequences for breaching this warranty are serious. The prescribing clause (FAR 3.402(a)) and the operative contract clause (FAR 52.203-5(a)) state that for any breach or violation, "the Government shall have the right to annul this contract without liability or to deduct from the contract price or consideration, or otherwise recover, the full amount of the contingent fee." In other words, if FEMA were to conclude that Debtor had entered into a contingent fee agreement with Judgment Creditors, or had actually paid Judgment Creditors a contingent fee, FEMA could potentially seek to annul Debtor's contract, refuse any further payment to Debtor, and potentially bring a claim to claw back some or all of the monies already paid (including at a minimum a dollar-for-dollar claim against Debtor for

any contingent fee amounts voluntarily paid by Debtor to the Judgment Creditors). Given this regulatory backdrop, the Trustee's desire to abandon the pending Eleventh Circuit Appeal, and instead voluntarily pay the Judgment Creditors millions of dollars pursuant to the Judgment Creditors' own theory that a "success fee" was owed as commission for helping Debtor obtain or secure either the FEMA contract or subsequent task orders under the contract, seems imprudent and borderline reckless.[7] There would be nothing in this scenario that would stop FEMA from bringing a claim against Debtor, citing Debtor's voluntary abandonment of its appellate rights as an implicit concession, and arguing that without regard to the subjective intent of the Debtor or the Trustee, the objective facts established that Debtor had made a prohibited contingent fee payment to the Judgment Creditors. As already noted, if FEMA were to pursue such a course, the financial consequences for the Debtor, the bankruptcy estate, and by extension the Members, could be devastating.

---

[7] Although the Judgment Creditors' position has always been grounded in its subjective interpretation of the original consulting agreement, a "success fee" contingent on the award of a task order under an existing contract would likewise constitute an illegal commission. References in the FAR to a contract are construed as including not only the original contract, but subsequent agreements in the form of task orders or modifications. *See* FAR 2.101. Therefore, the result is the same whether the Judgment Creditors' claim is based on the original consulting agreement or an alleged modification.

The Trustee's Motion seeking approval of the Proposed Settlement demonstrates a complete lack of understanding and indifference to the regulatory and contractual risks arising from the longstanding prohibition against contingent fees in the federal procurement arena. And there is certainly nothing in the Trustee's Motion to suggest that the Trustee identified or attempted to analyze these issues, before reaching a questionable settlement that would pay the Judgment Creditors 90% of what is almost surely, on the existing record, an unlawful contingent fee award.

For all of the foregoing reasons, and the Motion's lack of any discussion of the fourth *Martin* factor, that factor weighs against approving the Proposed Settlement.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that this Court reverse the Bankruptcy Court's decision and vacate the Order.

Dated: February 20, 2024          Respectfully Submitted,

                                  **THE ROSNER LAW GROUP LLC**

                                  */s/ Frederick B. Rosner*
                                  Frederick B. Rosner (DE 3995)
                                  Zhao (Ruby) Liu (DE 6436)
                                  824 Market Street, Suite 810
                                  Wilmington, DE 19801
                                  Telephone: (302) 777-1111
                                  rosner@teamrosner.com
                                  liu@teamrosner.com

**GOLENBOCK ASSOR BELL & PESKOE LLP**

Michael M. Munoz (admitted *pro hoc vice*)
711 Third Avenue
New York, New York 10570
Telephone: (212) 907-7345
mmunoz@golenbock.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Frederick B. Rosner, submit this certification pursuant to Rule 8015 of the Federal Rules of Bankruptcy Procedure:

1.     The foregoing Brief for Appellants complies with the length limits of Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure because, excluding those portions of the document exempted by Rule 8015(a)(7)(B) of the Federal Rules of Bankruptcy Procedure 8015(g), this document contains 9824 words.

2.     The foregoing Brief for Appellants complies with the typeface and typestyle requirements of Rule 8015(a)(5)(A) of the Federal Rules of Bankruptcy Procedure, because this document has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 Times New Roman.

Dated: February 20, 2024                    By: */s/ Frederick B. Rosner*
                                                Fredrick B. Rosner